IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CARLA ANDERSON                                                                      PLAINTIFF

V.                                              NO. 13-3089

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration                DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Carla Anderson, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) partially denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed her applications for DIB and SSI on April 21, 2010, alleging an inability to work since April 14, 2009, due to an injury to her left shoulder, depression, anxiety, and high blood pressure. (Tr. 131-135, 138-139, 168, 172). An administrative hearing was held on July 26, 2011, at which Plaintiff appeared with counsel and testified. (Tr. 32-71).

By written decision dated June 25, 2012, the ALJ found that from April 14, 2009 through December 19, 2010, Plaintiff had the following severe impairments: left shoulder degenerative

joint disease/impingement bursitis/adhesive capsultis status post surgery (x 2); hypertension; bipolar disorder/major depressive disorder/adjustment disorder/depressive disorder not otherwise specified (NOS); panic disorder/post-traumatic stress disorder/anxiety disorder NOS; pain disorder; and borderline personality disorder. (Tr. 15). However, the ALJ found that from April 14, 2009 through December 19, 2010, Plaintiff did not have an impairment or combination of impairments that met or equaled the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 15). The ALJ also found that from April 14, 2009 through December 19, 2010, Plaintiff had the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could lift no more than 5 pounds with her dominant upper extremity; the claimant could perform no more than occasional pushing and pulling with the left upper extremity; the claimant could lift no more than ½ pound with her left upper extremity with the elbow at the side; the claimant could perform no lifting above waist level with her left upper extremity; and the claimant could perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, with few variables and where little judgment is required, and where the supervision required is simple, direct, and concrete.

(Tr. 16). The ALJ found that from April 14, 2009 through December 19, 2010, Plaintiff was unable to perform any past relevant work and that there were no jobs that existed in significant numbers in the national economy that Plaintiff could have performed, and that Plaintiff was under a disability from April 14, 2009 through December 19, 2010. (Tr. 19).

In the same decision, the ALJ found that beginning on December 20, 2010, Plaintiff had not developed any new impairment or impairments, and that her current severe impairments were the same as those present from April 14, 2009 through December 19, 2010. (Tr. 19). The

-2-

AO72A
(Rev. 8/82)

ALJ reported that beginning December 20, 2010, Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing. (Tr. 19). The ALJ further found that medical improvement occurred and Plaintiff's disability ended as of December 20, 2010. (Tr. 21). The ALJ found that beginning on December 20, 2010, the Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can only occasionally work overhead with her nondominant upper left extremity; the claimant can occasionally push and pull with her upper left extremity; and the claimant can perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, with few variables and where little judgment is required, and where the supervision required is simple, direct, and concrete.

(Tr. 22). With the help of a vocational expert (VE), the ALJ determined that beginning December 20, 2010, Plaintiff was capable of performing past relevant work as a cashier. (Tr. 25). The ALJ therefore concluded that Plaintiff's disability ended December 20, 2010. (Tr. 26).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which considered additional evidence and denied that request on August 6, 2013. (Tr. 1-5). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 5). Both parties have filed appeal briefs and the matter is now ripe for consideration. (Docs. 8, 10).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

**II.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnard, 292 F. 3d 576, 583 (8th Cir.

2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnard, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or

mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**III.    Discussion:**

Plaintiff raises the following issues on appeal: 1) Whether there is substantial evidence to support the ALJ's decision that Plaintiff is not disabled after December 20, 2010; and 2) Whether the ALJ erred in finding that Plaintiff's condition had medically improved as of December 20, 2010. (Doc. 8).

The Court recognizes the ALJ utilized the eight-step evaluation process for determining continuing disability. (Tr. 13-15). However, it was not necessary to do so, because when in a single proceeding, the fact of disability, the extent of the disability, and the duration of the disability are all determined, the case is not a medical improvement case. Camp v. Heckler, 780 F.2d 721, 721-722 (8th Cir. 1986); Morrison v. Colvin, 2014 WL 668920 at n.3 (W.D. Ark., Feb. 20, 2014). Therefore, the Court's role at this stage is to determine whether substantial evidence supports the ALJ's decision that Plaintiff had the RFC to perform substantial gainful activity as of December 20, 2010.

As a result of an injury Plaintiff incurred as a health aide in 2009, on September 2, 2009, Plaintiff underwent shoulder surgery by Dr. Joseph Ricciardi. (Tr. 471-481). By September 22,

2009, Dr. Ricciardi reported that Plaintiff's shoulder wound was healing well. (Tr. 290). However, on October 16, 2009, Plaintiff complained to Dr. Ricciardi of snapping and popping in her left shoulder and two areas of her wound where something seemed to be sticking out. (Tr. 288). Dr. Ricciardi noted that Plaintiff had missed a lot of physical therapy due to flooding in her neighborhood, and that she needed additional physical therapy. (Tr. 288). By January 15, 2010, Dr. Ricciardi recommended a consultation from Dr. Miles Johnson for EMG's and nerve conduction studies from the neck to the fingertips. (Tr. 283). On February 17, 2010, Plaintiff was examined by Dr. Johnson, who found that Plaintiff's symptoms were somewhat improved with a TENS unit and pain pills (Tr. 304), and that her motor skills in the upper extremities were grossly intact except for 4/5 strength noted in the left upper extremity. (Tr. 305). There was shoulder pain with resisted abduction, there was no obvious atrophy, and tone was normal. (Tr. 305). The nerve conduction studies were performed on the left median and ulnar motor nerves, and revealed normal distal latencies, amplitudes, and conduction velocities. (Tr. 305). The EMG examination of the left upper extremity was significant for abnormal complex repetitive discharges being noted in the left supraspinatus, and the paraspinal examination was unrevealing. (Tr. 305). His impression was:

> Electrodiagnostic study is suggestive of a diagnosis of an incomplete left brachioplexopathy versus C5-6 radiculopathy. Paraspinal examination was unrevealing at this time, so I am unable to put the level of the lesion at the cervical spine with certainty. At this time, there is no evidence of generalized peripheral neuropathy or peripheral nerve entrapment syndrome or injury such as median or ulnar neuropathies.

(Tr. 305). On February 28, 2010, Dr. Ricciardi opined that Plaintiff may have reached maximum benefits of orthopaedic treatment at that time, and that after her neurology assessment she may be unable to return to her work as a CNA and would probably benefit from a functional

evaluation. (Tr. 280).

On May 25, 2010, Dr. Michael W. Morse, of Neurological Associates, found that Plaintiff had significant limitation of range of motion of her left shoulder and tenderness to palpation of the left shoulder. (Tr. 265). His impression was:

> This patient has a musculoskeletal neck and shoulder injury that was made worse with surgical intervention. I do not really appreciate any evidence of a cervical plexopathy on her exam. She had some minor changes in her supraspinatus muscle on the left, but normal reflexes. It is difficult to assess her strength because of give-way weakness. She has a minimal temperature difference between the palms of both hands and no significant trophic changes or skin changes in the upper extremity on the left.
>
> I would like to get a MRI of the cervical spine to make sure there is not an underlying disc herniation. If there is, I would recommend PT on her neck and perhaps epidural steroids.
>
> If there is not, it might be worthwhile to refer her to the pain clinic to see if they can give her anything to benefit her. I do not think there is any RSD given the lack of significant temperature changes, trophic changes, or tenderness to light touch.
>
> Unfortunately, PT on her shoulder seems to make things worse. She is going to have follow-up with her orthopedist for a final rating on her shoulder and to see if he has anything else to offer her.
>
> I will see her back after her scan today.

(Tr. 265). In an Addendum, Dr. Morse stated that Plaintiff came back from the MRI, and that she did have some spondylitic changes on the left at C6-7. (Tr. 266). He further reported that this did not correspond to the amount and type of pain she was having in her cervical spine. The MRI was reviewed with the case manager, Debbie Blaylock, and Plaintiff. His recommendation was that Plaintiff follow-up with her orthopedist as he thought the majority of her pain was coming from the musculoskeletal system, specifically her shoulder, and not from her neck. (Tr. 266).

On July 1, 2010, Dr. Terry J. Sites, an orthopedist, conducted an Independent Medical Examination. (Tr. 322-326). Dr. Sites noted that Plaintiff smoked a pack of cigarettes per day, and had done so for approximately 25 years. (Tr. 324). Dr. Sites reported that this was a difficult case and highly complex "given that the patient has already undergone a failed surgical procedure, now with worse pain." (Tr. 325). He also noted that Plaintiff had a history of depression and anxiety, and had not responded well to physical therapy, preop or postop. He presented three options, and opined that Plaintiff was not able to return to her job as a nursing aide at that time, but that "[s]he is not unable to work in any capacity." (Tr. 326). He stated at that time that he would allow her to currently work at unrestricted use of her lower extremities and right upper extremity with no lifting over 5 pounds, and with her left upper extremity, he would limit her to no repetitive use, no lifting over ½ pound with her elbow at her side and nothing above waist level. (Tr. 326).

On July 6, 2010, non-examining consultant, Dr. David L. Hicks, completed a Physical RFC Assessment. (Tr. 34-321). He found Plaintiff could perform light work and was limited in reaching all directions (including overhead), and could only occasionally overhead reach with the left upper extremity. (Tr. 315-317).

On August 18, 2010, Dr. Terry L. Efird conducted a Mental Diagnostic Evaluation. (Tr. 327-331). At said evaluation, Plaintiff reported having applied for disability benefits "because I'm not working right now. I was hurt on the job; and, I need some medical insurance. I need some help." (Tr. 327). She reported that she had been experiencing excessive worry for "years." (Tr. 327). She also reported that she had suffered from depression and anxiety for most of her life. (Tr. 327). Dr. Efird found that Plaintiff's ability to perform basic self-care tasks

independently was endorsed and that her ability to perform household chores adequately was described as impaired by physical pain and lifting restrictions. (Tr. 328). Dr. Efird diagnosed Plaintiff with:

> Axis I:  Depressive disorder NOS; anxiety disorder NOS
> Axis II: Deferred
> Axis V:  50-60

(Tr. 330). Dr. Efird further found that Plaintiff communicated and interacted in a reasonably socially adequate manner, communicated in a reasonably intelligible and effective manner, had the capacity to perform basic cognitive tasks required for basic work like activities, and that no remarkable indications of cognitive inefficiency were noted. (Tr. 330). Dr. Efird further found that no remarkable problems with attention/concentration were noted, that no remarkable problems with persistence were noted, and that no remarkable problems with mental pace of performance were noted during the evaluation. (Tr. 330).

It is noteworthy that on August 23, 2010, Plaintiff met with Michael Jeppsen, L.A.C., at Ozark Guidance Center, and reported that she moved in with her aunt two months prior to help care for her. (Tr. 418). A Mental RFC Assessment and Psychiatric Review Technique forms were completed by non-examining consultant Dr. Jay Rankin, on August 24, 2010, in which he found that Plaintiff appeared capable of unskilled work. (Tr. 332-335, 338-350).

On September 15, 2010, Dr. Terry Sites performed surgery on Plaintiff's left shoulder, and anticipated that she would be ready to return back to her regular duties within 8 to 12 weeks. (Tr. 354). On September 16, 2010, Physical Therapist Henry Adamos opined that Plaintiff's restorative potential was excellent. (Tr. 528). On September 23, 2010, Plaintiff reported to Boston Mountain Rural Health Center that it was "going very well" with her shoulder. (Tr. 366).

On September 24, 2010, a report from Ortho Spine Care revealed that Plaintiff displayed improved mobility of her shoulder girdle with greater response within upper middle traps and rhomboids with scapular protraction and retraction. (Tr. 525). On September 29, 2010, Plaintiff reported to Dr. Wesley K. Cox that she was doing well and said that she felt very good and had no problems or complaints. (Tr. 357). On November 3, 2010, Dr. Sites reported that Plaintiff was "doing very well with her left shoulder, having very little pain." (Tr. 356).

On November 8, 2010, Plaintiff reported to Michael Jeppsen at Ozark Guidance that she had surgery on her shoulder and "got pretty much my range of motion back. This fixes the mistakes of the first surgery on 9/2/09." (Tr. 408). By November 10, 2010, Dr. Thomas Embry, one of Plaintiff's treating physicians, reported that Plaintiff had fairly good range of motion of her shoulders. (Tr. 360).

On December 1, 2010, Dr. Sites reported that Plaintiff was doing extremely well postop left shoulder, having minimal discomfort, and had missed a couple of weeks of therapy for some personal reasons. (Tr. 502). She did feel that physical therapy had been beneficial. (Tr. 502) Dr. Sites concluded that she should do an additional two weeks of strengthening and work hardening, followed by a home exercise program, "allowing her to return to regular work duties on 12/20/10."[1] (Tr. 502).

On January 26, 2011, Dr. Sites reported that Plaintiff had some occasional mild pain at the limits of motion and had been out of therapy since early December. (Tr. 501). His impression was post left shoulder arthroscopy for adhesive capsulitis, retained painful sutures, with an intact rotator cuff. (Tr. 501). Dr. Sites believed that Plaintiff had reached maximum medical

---

[1] December 20, 2010 would have been the Monday after two full weeks had passed from December 1, 2010.

improvement, had already been given a rating in the past, and that there was no additional impairment. (Tr. 501). He further reported that she may perform her regular work duties without restriction. "There is a note that she may have some pain if she were to do work above shoulder level which required repetitive abduction. All was fully discussed. This is a final report." (Tr. 501). On May 9, 2011, Plaintiff advised Dr. Sites that her left shoulder had been doing very well in terms of movement, but had developed some anterolateral shoulder pain.(Tr. 500). Dr. Sites recommended a course of treatment and noted that she did not need formal therapy and would do her home exercise program along with the TENS unit. (Tr. 500). On June 16, 2011, Plaintiff told Dr. Sites that she still had some pain in the shoulder, mostly achy and anterolateral in nature. (Tr. 548). Dr. Sites noted there was no swelling, that she had good strength for all resisted motor motions about the shoulder, and that there was no impingement. (Tr. 548). Dr. Sites concluded:

> She does have some pain in her shoulder but significantly decreased compared to her preop shoulder. I feel she has reached maximum medical improvement. There is no additional impairment as it relates to her left shoulder after this recent surgery. Her work capacity is unrestricted with regular work duties. She has some mild residual pain requiring no specific treatment currently. We will see her back on an as needed basis.

(Tr. 548).

On September 30, 2011, Plaintiff saw Dr. Embry and refused advice to see a pain medicine specialist and continued to smoke one pack per day. (Tr. 645). On December 9, 2011, a Mental diagnostic Evaluation was conducted by Stephen R. Harris, Ph.D., C.E.B.P. - Psychologist. (Tr. 600-604). Dr. Harris found that Plaintiff had a GAF score of 52, was poor in socialization skills, and would have difficulty in the area of coping with basic work-like tasks. He further found that she showed no particular difficulties in the ability to concentrate and attend

during the evaluation. (Tr. 604). He reported that due to her anxiety, Plaintiff may have difficulty in persistence and difficulty in meeting timeframes. (Tr. 604). In his Medical Source Statement of Ability to do Work-Related Activities, Dr. Harris found that Plaintiff had mild to moderate restriction in the ability to make judgments on complex work-related decisions; had mild restriction in the ability to make judgments on simple work-related decisions and understand and remember complex instructions; had mild to moderate restriction in interacting appropriately with the public, interacting appropriately with supervisors, and interacting appropriately with co-workers; and had moderate restriction to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 605-606).

On January 10, 2012, Katherine Darling, APN, at Health Resources of Arkansas, reported that Plaintiff reported her anxiety and depression was "OK" but that her grown son and 3 grandchildren were living with her in her one bedroom apartment and she was "situationally depressed" and had increases in anxiety. (Tr. 627). (Tr. 627).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical

evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In this case, the ALJ clearly considered all of the evidence in the record. For the closed period, he gave significant weight to Dr. Sites, Plaintiff's treating surgeon, and little or no weight to Dr. Ricciardi's opinion, based upon the fact that the surgery later performed by Dr. Sites was apparently successful. (Tr. 18). The ALJ also gave substantial weight to the opinions of Dr. Harris, who examined Plaintiff, and Dr. Efird, whose opinion was consistent with that of Dr. Harris. (Tr. 18).

With respect to the opinion evidence since December 20, 2010, the ALJ gave substantial weight to the opinions of all of Plaintiff's treating physicians, with two exceptions. He gave little or no weight to the opinion of Dr. Ricciardi, as he opined that her shoulder condition would not improve, that all therapeutic modalities had been exhausted, and that she should not return to work. (Tr. 24). As noted by the ALJ, the record demonstrated that this opinion was inaccurate, as Dr. Sites was able to perform a second procedure on Plaintiff's shoulder that produced successful results. (Tr. 24-25). The ALJ also discounted the opinion of Dr. Embry, one of Plaintiff's treating physicians, to the extent it differed from the ALJ's findings. (Tr. 25). The ALJ reasoned that there was no objective medical evidence in Dr. Embry's treatment records to support his diagnosis of carpal tunnel syndrome on February 10, 2010. (Tr. 25).

The ALJ found that Plaintiff's statements were not credible because her allegations were inconsistent with Dr. Sites' observations and opinions and with the information Plaintiff provided to Dr. Sites. (Tr. 22). The ALJ took into consideration Dr. Sites' observation that

AO72A
(Rev. 8/82)

Plaintiff might have some pain if she were to do work above shoulder level requiring repetitive abduction, and incorporated it into his RFC for light work with only occasional use of her upper nondominant left extremity overhead and where she is only occasionally required to push and pull with her upper left extremity. (Tr. 22-23).

With respect to Plaintiff's mental impairments, the ALJ found that there was reason to question Plaintiff's assertions regarding her mental limitation, noting that she made conflicting statements regarding the effectiveness of her medication, and the cause of Plaintiff's alleged impairments. (Tr. 23-24). Nevertheless, the ALJ limited Plaintiff to unskilled work in his RFC. (Tr. 24). The ALJ further explained that Plaintiff successfully worked with mental impairments she now alleges are causing her to be disabled, and the fact that Plaintiff alleged severe limiting pain but does not take narcotic based pain relieving medications. (Tr. 24). The ALJ gave substantial weight to the opinions of the non-examining state agency consultants. (Tr. 24).

Plaintiff places great emphasis on the various GAF scores assigned to her by various mental health providers, noting that many were below 50. However, it appears that all of the GAF scores below 50 were given by individuals who do not qualify as "acceptable medical sources" under 20 C.F.R. § 416.913(a)(2013). The two acceptable medical sources - Dr. Efird and Dr. Harris, assigned GAF scores of 50-60 and 52, respectively. (Tr. 330, 603). Accordingly, Plaintiff's argument on this issue is without merit.

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's decision.

**IV.   Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial

evidence supporting the ALJ's partially favorable decision that Plaintiff was disabled between April 14, 2009 and December 19, 2010, but not disabled from December 20, 2010 through the date of his decision, and thus the decision should be affirmed. The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

IT IS SO ORDERED this 3rd day of November, 2014.

/s/ *Erin L. Setter*
HONORABLE ERIN L. SETTER
UNITED STATES MAGISTRATE JUDGE